## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **COX OPERATING, L.L.C.** *et al.*<br>        **Plaintiffs**<br><br>**VERSUS**<br><br>**SETTOON TOWING, L.L.C.,** *in personam*<br>**and the Tug M/V MEGAN B. SETTOON**<br>**and her tow BARGE SMI-245, their**<br>**engines, rigging, tackle, etc.,** *in rem***; and**<br>**its/their POLLUTION, HULL &**<br>**MACHINERY, PROTECTION &**<br>**INDEMNITY, TOWER'S LIABILITY**<br>**&/OR MARINE LIABILITY INSURANCE**<br>**UNDERWRITERS**<br>        **Defendants** | **CIVIL ACTION NO.**<br><br><br>**JUDGE _____; SECTION " "**<br><br>**MAGISTRATE JUDGE _____**<br><br>**DIVISION " "** |

## ORIGINAL COMPLAINT IN ADMIRALTY

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff Cox Operating, L.L.C., as the operator (on its own and on behalf of and as authorized representative of non-operating owners and/or interest holders) of Well No. 149-D (Louisiana State Lease 195QQ) ("the Well"); together with Quarantine Bay, L.L.C., Cox Interests, L.L.C., BHST, L.L.C, Cox Oil, L.L.C. and RCL Capital Management, L.L.C., as owners and/or working interest holders in the Well (all of whom, together with Cox Operating, L.L.C. are hereby collectively referred to as "Cox"); and for its/their verified Complaint in admiralty against Settoon Towing, L.L.C. ("Settoon"), *in personam,* and the tug MEGAN B. SETTOON and barge SMI-245 (collectively, "Flotilla"), their engines, rigging, equipment, tackle, etc., *in rem*, allege upon information and belief as follows:

1

## JURISDICTION & VENUE

### 1.

This is an admiralty and maritime claim pursuant to Rule 9(h) of the Federal Rules of Civil Procedure and Rule C of the Supplemental Rules for Admiralty or Maritime Claims, and is within the original and exclusive jurisdiction of this Honorable Court pursuant to 28 U.S.C. §1333; and likewise within the original and exclusive jurisdiction of this Honorable Court pursuant to 33 U.S.C. §2717 (Oil Pollution Act of 1990, "OPA," §§33 U.S.C. §2701 *et seq.*); and within the original jurisdiction of this Honorable Court pursuant to 33 U.S.C. §1321(n) (Clean Water Act, "CWA").

### 2.

Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(1) and 33 U.S.C. §2717(b) (OPA) insofar as Settoon resides in this judicial District; and 28 U.S.C. §1391(b)(2), as well as 33 U.S.C. §2717(b) (OPA), insofar as a substantial part of the events and omissions and discharge of pollution/threatened discharge of pollution giving rise to Cox's claims occurred, and a substantial part of property that is the subject of the action is located in, this District; and insofar as the MEGAN B. SETTOON and barge SMI-245 are and/or will be (on information and belief) located in this District at the time of the filing of this Complaint.

## THE PARTIES

### 3.

Cox Operating, L.L.C. is a Louisiana limited liability company with its principal place of business in Dallas, Texas, and at all pertinent times was the operator of the Well, which is located in Quarantine Bay, Plaquemines Parish, Louisiana.

**4.**

Quarantine Bay, L.L.C. is Louisiana limited liability company with its principal place of business in Dallas, Texas, and at all pertinent times was a 51% working interest holder in the Well; Cox Interests, L.L.C. is a Louisiana limited liability company with its principal place of business in Dallas, Texas and at all pertinent times was a 42% working interest holder in the Well; BHST, L.L.C. is a Louisiana limited liability company with its principal place of business in Dallas, Texas and at all pertinent times was a .21% working interest holder in the Well; Cox Oil, L.L.C. is a Delaware limited liability company with its principal place of business in Dallas, Texas and at all pertinent times was a 6.51% working interest holder in the Well; and RCL Capital Management, L.L.C. is a Delaware limited liability company with its principal place of business in Dallas, Texas and at all pertinent times was a .28% working interest holder in the Well.

**5.**

*In personam* Defendant Settoon Towing, L.L.C. is a Delaware limited liability company with its principal place of business in Assumption Parish, Louisiana.

**6.**

*In rem* Defendant tug MEGAN B. SETTOON, United States Coast Guard ("USCG" official number 1192962, is a 2006-built 900 horsepower pushboat, fifty feet in length with a twenty foot beam, owned and operated at all times pertinent by Settoon.

**7.**

*In rem* Defendant barge SMI-245, USCG official number 1147555, is a 2003-built 170 foot, 599 gross ton steel-hull tank barge with a 6,500 barrel capacity, inspected by the USCG and

3

(on information and belief) certificated under 46 C.F.R. Subchapter D for carriage of liquid oil products, and owned and operated at all times pertinent by Settoon.

**8.**

Defendant ABC Insurance Company(-ies) and/or Underwriters, is/are foreign insurance company(-ies) and/or foreign organizations and/or underwriters of the insurance policies described hereafter, at all times pertinent herein, being authorized to do and doing business in the State of Louisiana and the jurisdiction of this Honorable Court, that issued policies of insurance to, and/or underwrote coverages in favor of, Settoon for its operations of the Flotilla affording coverage for (*inter alia*, and without limitation) pollution liabilities, hull and machinery "running down" liabilities, tower's liability, protection and indemnity liability, and/or other marine liabilities; all of which policies/coverages provide coverage for the accident sued on herein and which policy-(ies)/coverages inure to the benefit of Cox, thereby entitling Cox to maintain a direct action against the insurer, and thereby also rendering the defendant insurer(s) liable, with the other defendants sued on herein.

**FACTUAL ALLEGATIONS**

**A) The Allision**

**9.**

The Well in SL 195QQ was at all pertinent times an oil and gas well that was being produced by use of a gas-lift system, which involves injecting gas into the production casing to reduce the density of the liquid hydrocarbons in the production tubing thereby allowing the natural hydrostatic pressure of the well to force the hydrocarbons up through the tubing (i.e. a "lifting" effect) to supplement production, and was producing an average of approximately 25 barrels of crude and 18 MCF of gas daily prior to the incident at issue in this case.

4

**10.**

The Well (originally completed in 1961) had been damaged during Hurricane Katrina, and was repaired and produced intermittently between 2008 and 2011, but was shut in due to surface facility/flowline issues. However, the Well had been brought back into full and regular production on or about May 7, 2016, roughly five months prior to the incident at issue in this matter.

**11.**

In addition, several additional production zones/pay sands run along the same fault as the two productive formations (9B and 9C sands) that were being produced from the Well. These additional pay sands (the 10, 11 and 14 sands) were accessible via reentry through the original wellbore and/or via sidetracks from the Well, all of which could have been completed via workover operations that would not have required any additional permitting from the state of Louisiana. By contrast, any "new drill" at a separate location, would require coastal use permits from the Louisiana Department of Natural Resources, Office of Coastal Management, as well as increased operational costs as a result of compliance measures, due to the presence of public oyster seed grounds on the waterbottoms of Quarantine Bay.

**12.**

The Well itself consisted of a six-pile platform structure, five feet wide and fourteen feet long, with a "Christmas tree" valve/gauge/wellhead assembly connected to the production tubing and other well casing, various ancillary flow/gas-lift lines running from the side of the structure, and a navigational aid light assembly affixed to the topside of the platform as required by United States Coast Guard ("USCG") regulations.

4834-3535-9549 v4
2900331-000046 03/07/2017

**13.**

At all pertinent times the navigational aid light and its associated equipment on the Well were functioning properly.

**14.**

Additionally, the National Oceanic and Atmospheric Administration ("NOAA") official nautical chart number 11364 for Quarantine Bay indicates an "Obstruction - Position Approximate" in the location of the Well; and further warns in general that "[u]ncharted platforms, gas and oil well structures . . . can exist within the limits of this chart."

**15.**

Oil and gas production from Cox's Quarantine Bay field was historically carried via a subsea crude pipeline to on-shore facilities pursuant to a first-purchaser marketing agreement with Gulfmark Energy, Inc. ("Gulfmark"), which in turn (pursuant to the marketing agreement) marketed, sold and delivered the product to end-user customers;[1] however, this pipeline was shut-in by its owner (Arrowhead Louisiana Gathering, LLC's ("Arrowhead")) on or about December 6, 2015, at which point Cox informed Gulfmark of the need to barge crude oil production from the Quarantine Bay Field to the on-shore facilities of Plains All American Pipeline, LP ("Plains," i.e. an end-user contracted through Gulfmark). In turn, Gulfmark arranged towing independently of Cox through Plains, who (on information and belief) ultimately contracted with Settoon for the towage. Under this framework, Settoon began barging product from Quarantine Bay to the Plains facilities (with the first towage occurring on December 10, 2015).

---

[1] Under this type of first-purchaser marketing agreement a producer like Cox initially sells its product to a third-party intermediary (like Gulfmark) then markets, sells and delivers the product to third-party end users.

4834-3535-9549 v4
2900331-000046 03/07/2017

**16.**

Cox does not have any contracts with Settoon relative to Cox's Quarantine Bay operations at the time of the Allision.

**17.**

In connection with the barging of Cox's product after the pipeline shut-in, between December 2015 and September of 2016, the tug MEGAN B. SETTOON had made upwards of fifty voyages from Tank Battery 2 (as shown in historic AIS data for the vessel), through the area of Quarantine Bay where the Well is located, to Plains' facility located across and southeast of Quarantine Bay in Venice, Louisiana; and Settoon's crews and shoreside management were or should have been aware of and familiar with the location of the Well in Quarantine Bay.

**18.**

On the morning and through the evening of September 13, 2016 (between approximately 0858 and 2220 hours), the MEGAN B. SETTOON with the barge SMI-245 in tow, was loading crude oil at Cox's Tank Battery 2 in the Quarantine Bay field.

**19.**

At some point after approximately 2220 hours on September 13, 2016, the Flotilla departed Tank Battery 2 *en route* to the Plains facility in Venice, Louisiana, in clear weather with no fog or rain and 10-mile visibility throughout the period according to NOAA data.

**20.**

At approximately 2255 hours on September 13, 2016, the Flotilla allided with the Well ("Allision") (which is only approximately a ten-minute boat ride from Tank Battery 2) in the navigable waters of Quarantine Bay, causing comprehensive damage to the Well and the platform structure.

4834-3535-9549 v4
2900331-000046 03/07/2017

**21.**

On information and belief, the Flotilla became stuck on top of the remnants of the Well, and the crew of the MEGAN B. SETTOON proceeded for several hours to attempt to power the Flotilla off of the Well, notwithstanding that the SMI-245 was fully loaded with a 5,600 barrel cargo of oil, and notwithstanding the potential threat of further damage to/explosions from the compromised Well structure and/or pollution from the Well and/or a hull breach in the loaded SMI-245 barge itself.

**22.**

At no point in time did the crew of the MEGAN B. SETTOON ever contact Cox to notify Cox that the Flotilla had struck the Well.

**23.**

At approximately 0015 hours on September 14, 2016 - just over an hour after the Allision had occurred and with no notice from Settoon to Cox of the incident - a low pressure alarm sounded at the Quarantine Bay quarters platform, signaling for the first time that some kind of a leak in the compressed gas system (i.e. the system used to inject gas to supplement production in the wells in the Quarantine Bay field); upon hearing the alarm at the quarters platform, Cox personnel deployed to the field to locate the leak indicated by the alarm.

**24.**

While preparing to deploy to the field for further investigation, Cox personnel noticed the lights of the Flotilla "spinning" in place in the general vicinity of the Well.

4834-3535-9549 v4
2900331-000046 03/07/2017

**25.**

Cox personnel deployed to the Flotilla and discovered that the Flotilla had allided with and was on stuck on top of the Well (with approximately *40 feet* of the length of barge SMI-245 over the well), and that the gas-lift line to the Well was broken, causing pressurized gas from the compressed gas system to bubble up and around the barge SMI-245.

**26.**

The Allision was in no way caused or contributed to by any action/inaction, fault, neglect, or want of care on the part of Cox or anyone for whom Cox was responsible, nor by any condition of the Well, and Cox exercised due care and compliance with all applicable laws and regulations with respect to the Well given its characteristics and all relevant facts and circumstances and likewise took precautions against foreseeable acts or omissions of vessel operators like Settoon and vessels like those comprising the Flotilla and the foreseeable consequences of those acts or omissions.

**B) Cox's Response to the Allision**

**27.**

Cox personnel immediately took actions to shut off the compressed gas to the Well and to shut the Well's flow line, and investigated the area of the Well for any evidence of hydrocarbon pollution.

**28.**

Immediately after discovering that the Allision had occurred and taking appropriate immediate response actions as described above, at approximately 0145 hours on September 14, 2016, Cox reported the Allision/stranding to Forefront Emergency Management ("Forefront"), Cox's designated emergency response contractor for actual or threatened oil pollution incidents,

9

and at 0255 Forefront in turn reported the Allision to the USCG for initiation of and coordination with the "Unified Command" response to the incident (consisting of the USCG, Cox, **and Settoon**, along with other state, local and federal agencies)[2] due to the substantial threat of marine pollution, all in accordance with OPA/Clean Water Act. In the meantime, ES&H Consulting Services ("ES&H," one of Cox's designated response contractors) deployed personnel and assets to the site of the Allision to commence response efforts.

## 29.

The Unified Command included representatives of *inter alia* the USCG, Cox, Forefront, ES&H **and Settoon** (specifically Chris Smart and Alex Pucheau), all of whom participated in sequential "update briefing" phone calls throughout the response efforts on the morning of the Allision.

## 30.

Between the time Cox personnel first discovered and reported the Allision to Forefront, and over the next several hours, Cox personnel deployed boom around the site of the Well/stranded Flotilla, established communication with the USCG, and continued to monitor the Well site to ensure that no hydrocarbons were leaking from the Well or from the barge SMI-245.

## 31.

Despite the fact that the Allision occurred at approximately 2255 hours on September 13, 2016, Settoon (on information and belief) did not make the initial call to the USCG to report the

---

[2] *See Riverkeeper v. Taylor Energy Co., LLC*, 309 F.R.D. 381, 384 (E.D. La. 2015):

> According to the U.S. Coast Guard's Incident Handbook, a Unified Command is comprised of agencies, organizations or private industries that can bring a large amount of tactical and support resources to the table. A Unified Command is formed when an incident impacts the jurisdictional or functional responsibility of more than one agency. The Unified Command allows the agencies to make consensus decisions regarding the incident, while carrying out their own agencies' jurisdictional responsibilities. *See* U.S. Coast Guard Incident Management Handbook, ch. 5 (Aug.2006), available at http://www.uscg.mil/hq/nsfweb/docs/FinalIMH18AUG2006.pdf.

4834-3535-9549 v4
2900331-000046 03/07/2017

incident until 0342 hours on September 14, 2016 (nearly five hours after the Allision occurred), notwithstanding the substantial threat of pollution (from both the Well and the barge) caused by the Allision.

**32.**

The Flotilla eventually dislodged itself from the Well at approximately 0748 hours on September 14, 2016.

**33.**

At that time, however, the Flotilla was under instructions from the Unified Command - in which Settoon was actively participating on briefing calls throughout the morning of the Allision - not to attempt any maneuvers or operate at all due to the risk of further damage from the compromised Well and/or pollution from the SMI-245 in the event of a barge tank rupture caused by the Allision and/or efforts to dislodge the barge from the remnants of the Well.  And in fact the Unified Command had authorized a lightering plan to remove the oil cargo in order to lighten the barge and float it off the Well (in lieu of risking the danger of rupturing the tanks during efforts to power the barge off the Well), with a tug and barge *en route* to the Allision site at the same time that the Flotilla, against orders not to maneuver, dislodged itself from the Well.

**34.**

Over the following days and weeks from September 14, 2016 to October 2, 2014, Cox took all necessary actions, and incurred all necessary expenses, in its capacity as the designated "responsible party" (as operator of the Well) under OPA 33 U.S.C. §§2701 *et seq.* and under the direction and mandate of the USCG vis-à-vis the Unified Command (in which Settoon participated),[3] to clean up and secure the site of the Well and the Well itself.

---

[3] *See, e.g.*, 33 U.S.C. §2702(b)(1)(B); 33 U.S.C. §1321(c)(1)(B); 40 C.F.R. §§300.1 *et seq.*

4834-3535-9549 v4
2900331-000046 03/07/2017

## C) Damage to the Well; Costs and Extent of Mandated Response under Unified Command Structure

### 35.

As a result of the Allision, the platform and Well structure were completely destroyed: the "Christmas tree" was found detached and buried in the mud on the bottom; the conductor casing was sheered 1.5 feet above the mudline; the surface casing was bent over and split in two places; and the flow and gas-lift lines were sheered near where the "Christmas tree" had been located on the platform, which in turn required immediate repair to maintain the integrity of the gas-lift distribution system for the other wells in Cox's Quarantine Bay field, and also interrupted production from other wells in the Quarantine Bay field as a result.

### 36.

Further, because the Well was bent over in an east-west direction at a 41 degree (from vertical) angle - indicative of the force with which the Flotilla struck the Well - the casing and production tubing strings were completely compromised, and divers (deployed at 0730 on the morning of the Allision) reported that the Well was on a vacuum with brackish water from Quarantine Bay flowing into the production formations.

### 37.

Due to the severe bend in the production tubing, which extended well below the mudline, Cox's response efforts required excavation of the waterbottoms around the Well to a circumference of several hundred feet, and from a baseline water depth of 9 feet down to 20 feet (i.e. 11 feet of waterbottom excavation), followed by installation of a coffer dam to prevent sloughing of sediment back around the Well, in order to isolate a section of unbent casing to allow for installation of a new wellhead control mechanism. Even then, the installation of the control mechanism was further complicated due to severe kinking caused by the Allision further

4834-3535-9549 v4
2900331-000046 03/07/2017

down the production tubing, which required the tubing to be pulled out of the wellbore until a straight section was found to allow for installation of the control mechanism.

**38.**

As a result of the Allision, Cox has lost the entirety of remaining hydrocarbon reserves in in the 9B and 9C sands in the original wellbore of the Well and will be required to plug and abandon the Well prematurely; or alternatively has lost the opportunity to immediately develop those remaining reserves. Further in this latter regard, due to the damage to the wellbore during response efforts (and specifically the severe below-mudline kinking of the casing/tubing), which in turn led to the required excavation of the area around the Well, Cox cannot reenter the original wellbore of the Well to even attempt to produce the remainder of the 9B and 9C sands, and would be required to drill a new well (with increased compliance costs vis-à-vis coastal use permitting) at least 1,000-2,000 feet away from the site of the original Well; and even with any such new well to attempt access of the remaining reserves in the 9B and 9C sands, the contamination of those productive formations by the huge influx of brackish water after the Allision has more than likely compromised those pay zones beyond recovery.

**39.**

Additionally, as a result of the Allision, Cox has lost the ability to produce the additional pay sands (10, 11 and 14), via re-entry or sidetracking, that exist at deeper depths in the original wellbore of the Well and/or along the same fault as the productive zones in the Well, because the damage to the original wellbore renders re-entry/sidetracking impossible.

**40.**

Further, due to the extent and nature of the damage to the Well caused by the Allision, including *inter alia* damage to the various casing strings below the mudline and the

13

required excavation/coffer damming of the site, Cox will incur increased costs to plug and abandon ("P&A") the Well (over and above what eventual P&A costs would have been had the Well not been damaged in the Allision), due to the subsea valve arrangement that was required to be installed as a result of the severe kinking of the production casing/tubing; and because of the increased water depth/bottom depression resulting from the excavation required for the response, which has rendered P&A by a standard submersible drilling rig and/or spud barge and/or liftboat/jackup rig impossible and will necessitate use of floating assets.

**41.**

Cox has incurred to date approximately $1,750,000.00 in removal, cleanup and response costs, as mandated and directed by the USCG Unified Command structure, as a result of the Allision.

**42.**

Cox has incurred, and will continue to incur, consequential damages as a result of the destruction of the Well, including without limitation, lost income and profits, as well as the continuing costs of coffer dam rental to secure the site, and increased costs of final P&A resulting from the response efforts.

**COUNT 1:**      **GENERAL MARITIME LAW NEGLIGENCE AND UNSEAWORTHINESS;** *PENNSYLVANIA & OREGON* **RULES; GROSS NEGLIGENCE**

**43.**

Cox re-alleges and re-avers Paragraphs 1-42 of its Verified Complaint as if copied here *in extenso.*

**44.**

4834-3535-9549 v4
2900331-000046 03/07/2017

The Allision was solely and proximately caused by the negligence, negligence *per se* and/or other fault of the crew of the Flotilla and and/or Settoon; and/or the unseaworthiness of the Flotilla; all of which negligence and unseaworthiness was at all pertinent times within the privity and knowledge of Settoon; including without limitation (on information and belief) in the following particulars (all of which Cox reserves the right to amend/supplement after discovery in this matter) that will be shown at trial:

- The Flotilla was manned by an inadequately trained and/or improperly licensed crew;

- The Flotilla was improperly manned in violation of applicable USCG regulations;

- The crew of the Flotilla violated numerous provisions of the Inland Rules (33 C.F.R.§§83.01 *et seq.*; 33 U.S.C. §2071), including without limitation Rule 5 (33 C.F.R. §83.05, "Lookout Rule"); Rule 6 (33 C.F.R. §83.06, "Safe Speed to avoid Collision/Allision"); Rule 7 (33 C.F.R. §86.07, "All Available Means to avoid Collision/Allision"); Rule 8 (33 C.F.R. §86.08, "Action to Avoid Collision/Allision");

- The MEGAN B. SETTOON was improperly equipped;

- The crew of the MEGAN B. SETTOON failed to (or failed to properly) consult relevant charts, electronic charts, and/or radar and other allision-avoidance equipment, and/or failed to adequately utilize a proper voyage plan and/or available equipment/systems for voyage planning and allision-avoidance;

- The crew of the Flotilla were careless, improperly trained, incompetent and inattentive to their duties, all in violation of applicable navigational rules and other statutes and regulations;

- The crew of the Flotilla failed to maintain a proper watch, and failed to navigate at a safe speed and/or with assistance of available onboard systems to avoid the Allision or to allow a complete stop or evasive maneuvers within the limits of visibility/radar range;

- The crew of the Flotilla failed to maintain a proper lookout under the circumstances, visually, by radar, or otherwise;

4834-3535-9549 v4
2900331-000046 03/07/2017

- The owners and managers of Settoon failed to properly inspect and maintain the Flotilla, failed to ensure that the Flotilla was properly and sufficiently equipped and crewed with properly trained individuals capable of performing operations and failed to take all actions necessary to ensure that the Flotilla was seaworthy at all pertinent times;

- The MEGAN B. SETTOON lost control of her course;

- The crew of the Flotilla failed to do what should have been done to avoid the Allision and/or to minimize or reduce the effect of the Allision;

- The crew of the Flotilla disregarded basic principles of good seamanship;

- The crew of the Flotilla failed to take early and substantial action to avoid the Allision; and

- the crew and/or Settoon's management and owners negligently and recklessly decided to commence the voyage at night, instead of waiting until first light, in the interest of saving costs;

- The Flotilla and/or the crew of the Flotilla failed to exercise reasonable care in the circumstances.

### 45.

Further, given that the above-alleged negligence of Settoon, and/or the crew of the Flotilla, and/or unseaworthiness of the Flotilla resulted in the Allision of the Flotilla with the stationary and fixed Well, the rule of *The Oregon* applies in this matter to create a rebuttable presumption of breach of duty and fault that shifts the burden of production and persuasion to the Flotilla which, under its own power, allided with the Well, a stationary object. *The Oregon*, 158 U.S. 186, 197 (1895).

### 46.

Likewise, given the above-alleged violations by Settoon and/or the crew of the Flotilla and/or the Flotilla, the rule of *The Pennsylvania* applies in this matter to create the presumption that such fault, if not the sole cause, was at least a contributory cause of the Allision; and the burden rests upon Settoon to show not merely that its fault (and/or that of the crew of the Flotilla

16

and/or the unseaworthiness of the Flotilla) might not have been one of the causes, or that it probably was not, but that it could not have been. *The Steamship Pennsylvania v. Troop,* 86 U.S. 125 (1873).

**47.**

As a result of the non-exclusive acts of negligence and/or unseaworthy conditions alleged above (and within Settoon's privity and knowledge) that proximately and solely caused the Allision, Cox has incurred damages including but not limited to:

- all costs of cleanup and response/removal resulting from the Allision as mandated by the Unified Command structure pursuant to OPA and/or CWA (which to date amount to approximately $1,750,000.00);

- costs of destruction to and/or repair/rebuilding of the Well;

- repairs to the gas-lift distribution system for the Quarantine Bay Field required as a result of the Allision;

- loss of the remaining reserves in 9B and 9C sands of the Well and/or delayed/diminished production of those reserves as a result of the Allision and the influx of brackish water into the formations, which is estimated to be between $2.5 million and $5 million (PV-10 value), of which approximately $1 million consists of reserves in the 9B and 9C sands that *will never be recovered* due to water contamination (subject to Cox's reservation of its rights to formally quantify these damages via expert analysis);

- alternatively, the costs of drilling a new well (due the impossibility of reentering the original wellbore in the Well as a result of downhole damage from the Allision) - including all costs of permitting and compliance - at a new site far enough removed from the site of the original Well to potentially recover any accessible remaining reserves in the 9B and 9C sands, which re-drill costs are estimated to be $2 million (subject to Cox's reservation of its rights to formally quantify these damages via expert analysis or otherwise);

- increased costs of P&A of the Well as a result of down-hole damage caused by the Allision and excavation of the Well site as part of the Allision response, which increased costs are estimated to be between $100,000 and $500,000 (subject to Cox's reservation of its rights to formally quantify these damages via expert analysis or otherwise);

17

- loss of, and/or delayed production of, the additional reserves in the 10, 11 and 14 production zones/pay sands that run along the same fault as the 9B and 9C sands, which additional reserves have an estimated PV-10 value of $2-3 million (subject to Cox's reservation of its rights to formally quantify these damages via expert analysis or otherwise), due to the inability to re-enter and/or sidetrack the Well as a result of the downhole damage to the wellbore caused by the Allision;

- prejudgment and postjudgment interest pursuant to the general maritime law and 33 U.S.C. §2705 (OPA) on all damages awarded;

- attorney's fees as may be recoverable pursuant to contract, statute and/or the general maritime law and/or OPA;

- other damages to be proven at the trial of this matter.

**48.**

Further, the negligence of Settoon as the owner and operator of the Flotilla in proximately causing the Allision was so reckless, willful, wanton and egregious as to warrant punitive damages pursuant to the general maritime law.

**49.**

Accordingly, Cox seeks recovery of all of the above-alleged damages, as well as all other damages to be proven at the trial of this matter, together with all other relief to which Cox is entitled at law or in equity.

**50.**

Further, Settoon is not entitled (and Settoon's insurers are likewise not entitled) to limitation of and/or exoneration from liability pursuant to the Shipowner's Limitation of Liability Act (46 U.S.C. §30501 *et seq*.) and/or OPA (33 U.S.C. §2704).

**COUNT 2:        MARITIME LIEN**

**51.**

Cox re-alleges and re-avers Paragraphs 1-50 of its Verified Complaint as if copied here *in extenso.*

18

**52.**

Cox has a maritime lien *in rem* against the Flotilla pursuant to the general maritime law as a result of the Flotilla's unseaworthiness, and/or the fault of its crew and/or Settoon, in causing the Allision.

**53.**

Accordingly, Cox seeks to enforce its maritime lien against the Flotilla pursuant to Rule C of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions.

**COUNT 3:    OPA AND/OR GENERAL MARITIME LAW CONTRIBUTION/INDEMNITY CLAIM; REQUEST FOR DECLARATORY JUDGMENT**

**54.**

Cox re-alleges and re-avers Paragraphs 1-53 of its Verified Complaint as if copied here *in extenso.*

**55.**

Pursuant to 33 U.S.C. §2702(d) and §2703, the Allision was caused solely by the acts or omissions of Settoon in its capacity as a non-contractually related sole-fault third party, and thus Settoon shall be treated as the responsible party for purposes of determining liability under OPA.

**56.**

Pursuant to 33 U.S.C. §§2702-2703 §2709 and §2717, Cox seeks a declaratory judgment declaring Settoon the sole responsible party (i.e. sole cause third party) under OPA for all removal costs and damages resulting from the Allision, and in turn asserts a claim for contribution against Settoon insofar as Settoon is solely liable under OPA and/or the general maritime law for all response and cleanup costs, as well as Cox's damages, incurred and expended by Cox in responding to the Allision (or alternatively, Settoon is comparatively liable

19

in contribution/indemnity under the general maritime law for its share of such costs and damages incurred by Cox as a result of the Allision).

**57.**

Accordingly, Cox seeks entry of a declaratory judgment, pursuant to 33 U.S.C. §2717(f)(2), declaring Settoon liable for all response/removal costs and damages pursuant to OPA resulting from the Allision.

**58.**

Cox likewise seeks entry of judgment in its/their favor and against Settoon for contribution/indemnity awarding Cox all of its/their damages and response/removal costs incurred as a result of the Allision.

**WHEREFORE**, Cox prays:

A.   That process in due form of law, according to the practice of this Honorable Court in cases of admiralty and maritime jurisdiction, issue *in rem* against the MEGAN B. SETTOON and barge SMI-245, citing them to appear and answer under oath all, and singular, the matters, alleged in this Verified Complaint;

B.   That a warrant for the arrest of the MEGAN B. SETTOON and barge SMI-245 be issued upon Cox's request, and that the vessels in turn be seized by the U.S. Marshal to be held as security against any judgment to be entered herein *in rem* against the Flotilla;

C.   That after due proceedings, judgment be entered in favor of Cox against the MEGAN B. SETTOON and barge SMI-245, *in rem*, for all damages, removal/response costs, costs and attorney's fees, and pre and postjudgment interest incurred by Cox as a result of the Allision;

D.   That after due proceedings, judgment be entered in favor of Cox against Settoon, *in personam*, for all damages, including punitive damages, removal costs, costs and attorney's fees, and pre and postjudgment interest incurred by Cox as a result of the Allision;

E.   That the MEGAN B. SETTOON and barge SMI-245, their engines, tackle, furniture, equipment, apparel, appurtenances, etc., after their arrest be condemned and sold, free and clear of all liens and encumbrances, to satisfy the judgment, and that the Court award Cox out of the proceeds of

20

the said sale, the full amount of its damages, removal costs, together with pre and postjudgment interest, costs and attorney's fees;

F.      That process in due form of law in accordance with the practices of this Honorable Court in cases of admiralty and maritime jurisdiction issue against Settoon *in personam*, citing Settoon to appear and answer under oath the allegations of this Verified Complaint;

G.      For such other, further and different relief, in law or in equity, as this Court may deem proper.

Respectfully submitted,

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ**

By:  s/ Robert C. Clotworthy
     **ROBERT C. CLOTWORTHY (#04204)**
     **CHRISTOPHER M. HANNAN (#31765)**
     201 St. Charles Avenue, Suite 3600
     New Orleans, Louisiana  70170
     Telephone:  (504) 566-5200
     Facsimile:  (504) 636-4000

*Attorneys for Cox Operating, LLC*

**DATE FILED VIA CM/ECF: MARCH 7, 2017**

4834-3535-9549 v4
2900331-000046 03/07/2017