# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| COX OPERATING, L.L.C. *et al.* <br> **Plaintiff** | **CIVIL ACTION NO. 17-1933** <br> **c/w No. 17-2087** |
| **VERSUS** | **SECTION "I"** |
| **SETTOON TOWING, L.L.C.** *et al.* | **JUDGE LANCE M. AFRICK** |
| **Defendant** | **MAGISTRATE DIV. 5** |
| | **MAG. MICHAEL B. NORTH** |

## MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING LIMITATION OF LIABILITY

Respectfully submitted,

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ**

BY: */s/ Christopher M. Hannan*
ROBERT C. CLOTWORTHY (#04204)
CHRISTOPHER M. HANNAN (#31765)
KRISTEN L. HAYES (#36490)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000

***Attorneys for Plaintiffs/Claimants
Cox Operating, LLC et al.***


# TABLE OF CONTENTS

Table of Authorities ................................................................................................ i

INTRODUCTION ................................................................................................1

I.  Factual Background ......................................................................................1

    A.  CORPORATE ADMISSION of Negligence, within Settoon's Privity and Knowledge ...........................................................................................1

    B.  Known Risks of Oilfield Structures/Night Navigation; Lack of Training/Procedures.............................................................................3

    C.  Settoon Completely Failed to Provide any Training/Procedures for - *or to even Identify* - Numerous Electronic Aid to Navigation Systems ........................10

II.  Law and Analysis........................................................................................16

    A.  Summary Judgment Standard ...............................................................16

    B.  Limitation of Liability - Two Step Process...........................................17

    C.  Settoon/Capt. Marceaux Admittedly/Presumptively Caused the Allision due to Fault/the Unseaworthiness within Settoon's Privity & Knowledge ...........19

III.  Conclusion ................................................................................................25

CERTIFICATE OF SERVICE ................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Am. Dredging Co. v. Lambert*,
    81 F.3d 127 (11th Cir. 1996) ...............................................................17

*ANR Prod. Co. v. M/V MEKHANIK DREN*,
    1989 WL 180064 (S.D. Tex. July 14, 1989)...........................................21

*Borque v. D. Huston Charter Servs., Inc.*,
    525 F. Supp. 2d 843 (S.D. Tex. 2007) ...................................................17

*Brister v. A.W.I., Inc.*,
    946 F.2d 350 (5th Cir. 1991) ...........................................................17, 18

*Brunet v. United Gas Pipeline Co.*,
    15 F.3d 500 (5th Cir. 1994) .................................................................19

*Clary Towing Co. v. Port Arthur Towing Co.*,
    367 F. Supp. 6 (E.D. Tex. 1973).............................................................20

*Combo Maritime, Inc. v. U.S. United Bulk Terminal, LLC*,
    615 F.3d 599 (5th Cir. 2010) ...............................................................

*Complaint of Patton–Tully Transp. Co.*, 797 F.2d 206, 211 (5th Cir.1986)................................17

*Complaint of Waterstand Marine, Ltd.*, 1988 WL 78776 (E.D. Pa. July 26, 1988) ...................18

*Cont'l Oil Co. v. Bonanza Corp.*,
    706 F.2d 1365 (5th Cir. 1983) ...............................................................18

*Cont'l Oil Co. v. M. S. Glenville*,
    210 F. Supp. 865 (S.D. Tex. 1962).........................................................20

*Farrell Lines Inc. v. Jones*,
    530 F.2d 7 (5th Cir. 1976) ...............................................................16, 17

*Hercules Carriers, Inc. v. Florida*,
    768 F.2d 1558 (11th Cir.1985) ......................................................17, 18, 22

*In the Matter of Texaco, Inc.*,
    570 F. Supp. 1272,1279 (E.D. La. 1983); 1985 A.M.C. 1650....................18, 19, 24

*In re Bald Head Island Transp., Inc.*,
    124 F. Supp. 3d 658 (E.D.N.C. 2015 ...................................................17

i

*In re Blessey Enters., Inc.*,
2010 WL 3720906 (E.D. La. Sept. 9, 2010) (Fallon, J.)........................................................19

*In re Cameron Boat Rentals, Inc.*,
683 F. Supp. 577 (W.D. La. 1988).....................................................................................20, 23

*In re Mid-South Towing Co.*,
418 F.3d 526 (5th Cir. 2005) .................................................................................................19

*In re Moran Towing Corp.*,
996 F. Supp. 2d 221 (S.D.N.Y. 2014)...................................................................................18

*In re Nagler*,
246 F. Supp. 3d 648 (E.D.N.Y. 2017) ...................................................................................17

*In re Settoon Towing, LLC*,
Case No. 07-1263, R. Doc. 102-1 ...........................................................................................4

*In Re Supreme Towing Co., Inc.*,
2010 WL 11561150 (E.D. La. Aug. 12, 2010) .................................................................22, 24

*In re Ta Chi Navig. (Panama) Corp., S.A.*,
513F. Supp. 148, 158 (E.D. La. 1981), *aff'd* 728 F.2d 699 (5th Cir. 1984) ..........................23

*In re Texaco, Inc.*,
570 F. Supp. 1272 (E.D. La. 1983).....................................................................................20, 24

*In re Texaco, Inc.*
denied....................................................................................................................................23

*In re: Diamond B Marine Servs., Inc.*,
2001 WL 1164914 (E.D. La. Sept. 28, 2001) *aff'd sub nom. Trico Marine Assets, Inc.
v. Diamond B Marine Svcs., Inc.*, 332 F3d 779 (5th Cir. 2003); 2003 A.M.C. 1355 ..18, 20, 24

*Int'l Marine, LLC v. Integrity Fisheries, Inc.*,
2018 WL 1123581 (E.D. La. Feb. 28, 2018) .........................................................................16

*Matter of TA CHI NAVIGATION (PANAMA) CORPORATION, S.A.*,
513 F.Supp. 148 (E.D.La.1981) *aff'd*, 728 F.2d 699 (5th Cir.1984).......................................18

*Moench v. Marquette Transp. Co. Gulf-Inland, L.L.C.*,
838 F.3d 586 (5th Cir. 2016) .................................................................................................25

*Osprey Ship Mgmt. Inc. v. Foster*,
387 Fed. Appx. 425; 2010 WL 2725236, 7 (5th Cir. July 1, 2010).........................................19

*Pennzoil Producing Co. v. Offshore Exp., Inc.*,
943 F.2d 1465 (5th Cir. 1991) ...............................................................................................18

ii

*Placid Oil Co. v. S. S. Willowpool*,
    214 F. Supp. 449 (E.D. Tex. 1963) ........................................................................20

*Regions Bank v. Gator Equip. Rentals, LLC*,
    2016 WL 4429947 (E.D. La. Aug. 22, 2016) .......................................................16

*Seacarriers Mar. Co. v. M/T Stolt Jade*,
    823 F. Supp. 1311 (E.D. La. 1993) ......................................................................20

*St. Phillip Offshore Towing Co. v. Wisconsin Barge Lines*,
    466 F. Supp. 403 (E.D.La.1979) ...........................................................................21

*Trico Marine Assets Inc. v. Diamond B Marine Servs. Inc.*,
    332 F.3d 779 (5th Cir. 2003) ........................................................17, 23, 24, 25

*TUG OCEAN PRINCE, INC. v. United States*,
    584 F.2d 1151 (2nd Cir.1978) ...............................................................................18

*United States v. Nassau Marine Corp.*,
    778 F. 2d 1111 (5th Cir. 1985) ............................................................................19


**STATUTES**

46 U.S.C. §3703 .............................................................................................................1

46 U.S.C. §§30501 *et seq.* ...........................................................................................1


**OTHER AUTHORITIES**

33 C.F.R. § 83.01 *et seq.* ............................................................................................8

33 C.F.R. § 164.72 ........................................................................................................4

46 C.F.R. Subchapter D, Subpart 35 ...........................................................................1

46 C.F.R. §30.25-1 .......................................................................................................1

46 C.F.R. § 35.01-50 ..................................................................................................21

46 C.F.R. §35.30-1 .......................................................................................................1

33 CFR §83.05 ............................................................................................................20

33 CFR §83.07 ............................................................................................................21

4814-1922-0835 v5
2900331-000046 05/18/2018

33 CFR §164.78 ................................................................................................................19

33 CFR §164.80 ................................................................................................................20

Fed. R. Civ. P. 56 ........................................................................................................16, 17

iv

## INTRODUCTION

Plaintiffs ("Cox") submit this memorandum in support of their Motion for Summary Judgment for dismissal of Settoon Towing, L.L.C.'s ("Settoon") Complaint for Exoneration from or Limitation of Liability pursuant to 46 U.S.C. §§30501 *et seq.* (Case No. 17-2087, R. Doc. 1), and 10th Affirmative Defense (limitation of liability) to Cox's Complaint (Case No. 17-1933, R. Doc. 4). The incident in this case resulted from negligence/unseaworthiness **admittedly, presumptively, and indisputably** within Settoon's privity/knowledge, thus barring limitation.

## I.     FACTUAL BACKGROUND

### A.     <u>CORPORATE ADMISSION</u> of Negligence, within Settoon's Privity and Knowledge

Cox's Well No. 149D in Quarantine Bay (the "Well") was destroyed on the night of September 13, 2016, when Settoon's M/V MEGAN B SETTOON ("Vessel"), pushing the fully loaded "red flag" oil barge SMI-245 (subject to 46 C.F.R. Subchapter D, Subpart 35[1]), ran over the Well (the "Allision") en route from Cox's Tank Battery #2 to a facility in Venice.

It is a threshold, indisputable matter of fact and law that Settoon is **<u>presumptively at fault</u>** for the Allision pursuant to the *Oregon* and *Pennsylvania* Rules (*see* §II.3 *infra*). Also, Settoon's initial internal reporting (in its NetSuite electronic incident tracking system, within 48 hours of the Allision) **expressly stated that Capt. Marceaux was "at fault"** for the Allision.[2]

And **Settoon's own admissions are <u>dispositive evidence</u> of its privity/knowledge of** the presumptive negligence/unseaworthiness that caused the Allision.  On September 15, 2016 (within 48 hours of the Allision), Scott Lerille, Settoon's expressly designated "Responsible Person" for safe navigation,[3] confirmed **numerous "management failures"** caused the Allision:

---

[1] These regulations govern barge carriage of "flammable or combustible cargoes" including crude oil, 46 C.F.R. §§35.30-1, 30.25-1, are issued for the express purpose of "increased protection against hazards to life and property, for navigation and vessel safety, and for enhanced protection of the marine environment." 46 U.S.C. §3703.

[2] Ex. 1, pp. 158-161; Ex. 2.

[3] Lerille was designated as a "Responsible Person" in Settoon's Safety Management System ("SMS"), with express

**[M]y first impression was how in the hell do we run in here at night**?? **All I can see was a landmine of wellheads.** I looked at Andre [Detiveaux] and Jason [Porche] [(Settoon's two port captains)] and asked them how they transited through this field. **Tracklines!! Really...a freaking trackline is not that accurate and it all depends how much you are zoomed in or out to determine the accuracy of following it. These wellheads were way too close together to count on a trackline to get you through this field. Immediately I knew this could not continue**.

\*\*\*

…I went into the wheelhouse … and saw about 20 tracklines on Coastal Explorer [(the electronic chart system, "ECS," aboard the Vessel)] and asked him what the hell was that. **I said that I thought we had one master trackline and everyone was to only use that particular one**. He said that was not the process and that the crew **had to follow a trackline not any specific one.** I said y'all went through all the trouble of establishing trackline procedures and y'all never went to all the boats and deleted all the tracklines and made a master trackline and he said no they did not. **I just shook my head in disgust because I knew this was a management failure because the process was done half ass like a lot of stuff I see.**

\*\*\*

When I went in the wheelhouse, I glanced at the radar and it looked odd. Here we are in the Baptiste Collette channel and I could barely see the bank lines. I asked Darby to show me how to turn up the gain on the radar and I started playing with it. I turned the gain all the way down then turned it all the way up. Usually when it is all the way up, the bank lines get distorted. It didn't do that and they had a big red center where the boat is located **so you could not even pick up an obstruction in that area if there was one**. Again, I looked at Andre and said what the hell is this. He says all the little boats have these radars. **Here we are again, another management failure!!!**[4]

Thus, within 48 hours, Settoon's "Responsible Person" for navigation safety **<u>admitted that Settoon's "management failures" caused the Allision</u>.** These "management failures" demonstrated fundamental, systemic, and catastrophic failures **by Settoon's shoreside management** to protect the safety of its crew, third parties, and the environment in the specific context of nighttime transiting of oil fields, ECS "track line" navigation procedures, and radar use in inland oilfields with loaded red flag barges in tow. **The Lerille email <u>alone</u> indisputably proves fault within Settoon's privity/knowledge, and dispositively precludes limitation.**

---

responsibilities regarding *inter alia* safe navigation. Ex. 3, Settoon-1332; Ex. 1., p. 26-28, 29 ("[Lerille]…had that responsibility and authority to review navigational standards to make sure that vessels were operating safely, right? A Yes. Q Fair to say [Lerille] w[as] … the management link to the operation of the vessels day to day? A. Yes.").

[4]  *See* Ex. 3, Settoon-001332; Ex. 4, Settoon 035136-035138 (emphasis added).

And the undisputed record, expanding on Lerille's damning email, reveals many, many more systemic management failures/fault related to night navigation/"track line"/radar problems that rendered the Vessel unseaworthy and ultimately caused the Allision.

**B.      Known Risks of Oilfield Structures/Night Navigation; Lack of Training/Procedures**

For nearly a year prior to the Allision, Settoon (as part of its "gathering" division)[5] had been barging "red flag" hazardous oil cargoes from Quarantine Bay beginning in December of 2015, when the Black Bay Pipeline[6] that typically carried crude from Quarantine Bay to Plains Marketing LP's (Settoon's charterer) Venice facility was shut-in for maintenance/repairs; and during prior instances when that pipeline was shut in over roughly the decade preceding the Allision.[7] The Vessel and her crew **had made *over 50* trips into/out of Quarantine Bay on a roughly weekly basis** since between February 2016 (as did other Settoon vessels/crews) – passing the Well without incident every single time, and in fact using the Well (even though it was *uncharted* on the NOAA charts) as a landmark for when to turn toward Tank Battery #2.[8]

In addition to Quarantine Bay, "almost 100 percent of [Settoon's] work [is] within oil fields" that have "lots of wells in them."[9]  But **Settoon had no specific, written safety procedures, training, or guidance** for navigation while pushing loaded red flag barges in multi-well inland oilfields, in general or (more importantly) **at night**.[10] Settoon had no such measures in place **notwithstanding an identical 2007 incident** "in Bayou Perot, Louisiana, when a barge

---

[5]  *See* Ex. 5 ("Settoon's Gathering & Storage segment consists of over 25 boats and 60 barges used to transport and store crude oil and produced water throughout the inland waterways of Gulf Coast."); *see also* Ex. 1, p. 123.

[6]  *See* Ex. 6.

[7]  *See* Ex. 7, pp. 30-31; *see also* Ex. 8.

[8] Ex. 9, pp. 119-121; Ex. 10, pp. 79-80 (weekly route); 154-156; Ex. 8.

[9]  Ex. 7, p. 29-30; Ex. 1, p. 123 (Settoon's inland "gathering" business is "all inland oil fields.").

[10]  Ex. 1, p. 77, 79, 122-24.

3

pushed by the M/V CATHY M. SETTOON plowed over an [uncharted] oil wellhead" at night resulting in a multi-million dollar oil spill.[11]

Further the vessel crew at the time of the Allision knew there were uncharted wellheads all over Quarantine Bay - and **they knew the location** *of this specific uncharted Well* **because they used it as a landmark** for navigating in Quarantine Bay);[12] and the relevant charts (both paper and electronic) and Coast Pilot (one of the regulatorily required publications aboard the vessel, 33 C.F.R. § 164.72) – which Capt. Marceaux *never consulted* (and he actually consulted *the wrong chart*)[13] when he formulated his voyage plan for the date of the Allision[14] – both warned of uncharted and unlighted structures in the area.[15]  Yet, Capt. Marceaux expressly stated in his voyage plan that there was "NO HAZARD IN AREA" (all caps in original), notwithstanding the express warning of uncharted/unlit hazards in the charts and Coast Pilot.[16]

But when he formulated the voyage plan, **Capt. Marceaux <u>did not consult</u> with his relief Capt. Spigner**, nor any of the other regular crew, who had been making the Quarantine Bay run for months, in violation of Settoon's SMS requirement that "[b]**oth wheelmen** should discuss the route…and identify any areas of concern regarding navigational issues."[17] Settoon "[did] not know" whether any safety/management personnel monitored for compliance with this

---

[11]  *See* Ex. 11, *In re Settoon Towing, LLC,* Case No. 07-1263, R. Doc. 102-1, p. 1 (E.D. La. Nov. 25, 2008).

[12]  Ex. 9, p. 154; Ex. 10, pp. 112-13; Ex. 12, pp. 224; 254-55.

[13]  Specifically, NOAA Chart # 11364 depicts Quarantine Bay; however, Capt. Marceaux's voyage plan referred to NOAA Chart #11363, which **does not show** Quarantine Bay.  *See* Ex. 13, *available at* http://www.charts.noaa.gov/ PDFs/11364.pdf; Ex. 14, *available at* http://www.charts.noaa.gov/PDFs/11363.pdf.  *See* Ex. 12, pp. 156-160.

[14]  Ex. 12, pp. 161-63; 157-160; 223-24.

[15]  Ex. 15, p.2 ("Oil drilling equipment will be found throughout the area. There are numerous unlighted oil well structures in…Breton Soun[d] and the waters to the W[est] [i.e. Quarantine Bay].");  NOAA Chart #11364 ("Uncharted platforms, gas and oil well structures…can exist within the limits of this chart.").  *See also* Ex. 16, p. 3.

[16]  Ex. 12, pp. 313-314; Ex. 17.

[17]  Ex. 3, Settoon 1025-1027; Ex. 12, p. 248; Ex. 10, pp. 167-68.

4

requirement, even though that the "Director of Operations [was] responsible for implementing th[e] procedure and ensuring that vessel crews [were] aware of the requirements."[18]

Capt. Marceaux submitted his one-man voyage plan - **referencing the <u>wrong chart</u>**, and identifying "NO HAZARD" (despite *the expressly identified hazard* of uncharted wells that Settoon and its crews knew about) to Settoon's shoreside management/safety personnel (via email) **more than 24 hours before the Allision**,[19] without any response as to these errors.  And several prior voyage plans for other Quarantine Bay trips, all likewise submitted to Settoon's shoreside safety/management personnel,[20] **had the same incorrect chart reference** (Chart #11363 instead of #11364).   Settoon never corrected these errors, in violation of the "Risk Assessment" procedure in its SMS:

> 3.  It is the Master of the vessels **and Port Captain's responsibility** to ensure that all known risks to the crew and the vessel and the environment are identified and that proper preparations and briefings are conducted prior to each operation.
>
> 4.  It is the **Safety/Training Coordinator's responsibility** to ensure **that each previously known risk is included in crew safety meetings both at crew change and in vessel annual training and vessel safety meetings**.[21]

And astonishingly, despite the Bayou Perot incident, the chart/Coast Pilot warnings, and the fact the 100% of Settoon's gathering business is *in inland oilfields*, the "Risk Assessment's" list of "[k]nown and identified" hazards (such as bridge transit, docking/undocking) **does not even include uncharted/unlit oilfield structures**.[22]

Capt. Marceaux himself navigated past the Well into Quarantine Bay *the morning of the Allision* without incident, and admitted that **he <u>saw</u> and <u>navigated past</u> a well <u>uncharted</u> on**

---

[18]  Ex. 1, p. 53; Ex. 3, Settoon 1025.

[19]  Ex. 12, p. 156-160; 312-13; Ex. 18; Ex. 1, pp. 62-67.

[20]  Ex. 19.

[21]  Ex. 3, Settoon-1397.

[22]  Ex. 3, Settoon 1397-98.

**Coastal Explorer**, and passed it within "half a football field" - i.e. *only 50 yards*; but he did not mark the Well as an obstruction on Coastal Explorer **or** his radar **or** his GPS (see *infra* at §3).[23]

Notably, on the morning of the Allision, **even in full daylight with an <u>empty</u> barge,** Capt. Marceaux posted a separate lookout in the wheelhouse to act as "extra eyes…to guide [him] a little bit to bring back [his] memory [b]ecause [it had] been a couple of years since [he'd] been in [Quarantine Bay]." This was because Capt. Marceaux **was not the regular captain,** whom he had relieved only 5 days before the Allision.[24]  Also, Capt. Marceaux's one prior Quarantine Bay trip **was entirely during daylight**.[25]   Further, he **had <u>never been</u> <u>evaluated/assessed</u> by Settoon <u>as a captain</u>, in violation of the "profiency evaluation" procedures in Settoon's SMS,** because he "fell through the cracks."[26]   And the only two ride-along evaluations Capt. Marceaux ever had (both in 2012 before he became a licensed captain) **were in the Mississippi River/Intracoastal Waterway**,[27] which are *fundamentally different* than inland oilfield navigation in Quarantine Bay/Breton Sound.  Yet, Settoon deployed him to Quarantine Bay, even though one of the specifically identified risks in its "Risk Assessment" procedure is "[a] new route to a new destination that some of our captains and/or pilots do not have knowledge or coverage"; and even though Settoon's "Director of Operations [was] responsible to ensure that wheelhouse personnel are posted on a given route before holding an unsupervised watch" in a "New Geographical Area."[28]

However, Capt. Marceaux chose not to post a separate lookout, nor to use binoculars,

---

[23]  Ex. 20, Settoon-242-243; Ex. 12, p. 219; 254-55; 293.  According to the AIS track. the **only** uncharted well that Capt. Marceaux would have passed at roughly 50 yards as he turned into Quarantine Bay **was the Well 149D**.

[24]  Ex. 12,  pp. 168-69.

[25]  Ex. 12, p. 153-154; pp. 249-258.

[26]  Ex. 7, pp. 59-62; Ex. 21; Ex. 3, Settoon 001374-76; Ex. 12, p. 183.

[27]  Ex. 12, pp. 179-183; Ex. 22.

[28]  Ex. 3, Settoon-1398; 1034-1036.

while transiting out of Quarantine Bay **in full darkness with a full load of "red flag"** **hazardous crude cargo** on the night of the Allision - something the rest of the crew at the time **had never done -** even though he admitted that it "probably" would have helped prevent the Allision, and even though he **knew** there were uncharted wells (and had driven within 50 yards of one earlier that morning), and **should have known** of the existence of uncharted wells based on the chart warnings (even on the *incorrect* chart he consulted) and Coast Pilot warnings (which he never consulted).[29]   Further, Capt. Marceaux was attempting to **simultaneously** monitor his radar (all the way to the left of the bridge) and his Coastal Explorer screen/trackline (all the way to the right), while at the same time manipulating the overhead searchlight controls and supposedly keeping a line of sight through his windshield; as he (obviously) admitted, however, **he could not do all these things at the same time**.[30]   And without a proper lookout, he ran head-on over the same Well he had safely passed hours earlier, **over 400 feet off** his earlier safe track, as shown in the AIS tracks, and obviously well off any prior safe track:



[31]

---

[29] Ex. 10, pp. 91-92; Ex. 9, pp. 67-70; Ex. 12, p. 224, 325, 333.

[30] Ex. 12, pp. 328-29; *see* Ex. 34 (photos of wheelhouse layout).

[31] The green track indicates the vessel's incoming route into Quarantine Bay on the morning of September 13, and

Further, Capt. Marceaux had no explanation as to why the Well did not show up on his radar; and *every other crew member*, as well as Settoon's own expert confirmed that the Well should have appeared on the radar if it were set and monitored properly;[32] and the Lerille Email indicated the radar **was not even properly functional** for the Vessel.    That said, Capt. Marceaux testified that the radar was simply "hit or miss" in picking up oil platforms:

> Q.    Your experience had been in the past, sometimes the radar picked up these small structures, sometimes it doesn't?
>
> A.    Correct.
>
> Q.    Was that due to something wrong with the radar or that was the radar?
>
> A.    Basically, that was the radar.[33]

Settoon **never provided any radar training** to Capt. Marceaux, nor had he ever read the radar manual;[34] and the Lerille Email confirms that the radar **was not set or working properly**.

At the time of the Allision, Settoon had no specific policy regarding posting of a separate lookout during nightime transiting of inland oilfields with loaded red flag barges.[35]  Moreover, Capt. Marceaux testified he **never had any training at all** on the Inland Rules of the Road (33 C.F.R. § 83.01 *et seq.,* including the Lookout Rule, Rule 5, §83.05) during his carreer with Settoon.[36]  When asked about his understsanding of the Lookout Rule, he simply stated "just to be aware of all of your surroundings, what's around you"; and then testified the only time a separate lookout is necessary is "if I'm in a tight quarter area, I would have an extra set of eyes

---

the red track indicates the outgoing route on the evening of September 13, 2016, up to the point of the Allision.

[32]  Ex. 12, p. 36; Ex. 10, pp. 112-113; Ex. 9, p. 120, 155; Ex. 23.

[33]  Ex. 12, p. 38.

[34] Ex. 12, pp. 197, 201.

[35]  Ex. 1, p. 122-24.

[36]  Ex. 12, p. 198-199.

with me. **Other than that, I wouldn't**."[37] This woefully inadequate understanding of the Lookout Rule is explained by Settoon's corporate representative testimony:  **Settoon provided no specific training regarding the Lookout Rule** vis-à-vis nightime transit of inland oilfields, notwithstanding its prior experience in Bayou Perot, and  that all its business was in such fields.[38] Moreover, Capt. Marceaux **failed to follow even his own erroneous "close quarters only" intepretation of the Lookout Rule**: he posted no lookout *at night* knowing full well he had navigated *within 50 yards* of an uncharted obstruction earlier that day.

Nor did Settoon have any policy prohibiting or otherwise providing general guidance for nighttime navigation of inland oilfields **despite its actual knowledge** (via the Bayou Perot incident) and **constructive knowledge** (via the operational experience of its crews) that navigating in these fields at night was dangerous and to be avoided.  Specifically, as Capt. Spigner testified, he had never left Quarantine Bay at night, and his general practice in Cox's Eloi Bay field (across Breton Sound from Quarantine Bay) was not to depart at night due to safety concerns because of the number of wells; and deckhand Davison likewise testified that he had never left Quarantine Bay at night in roughly 9 months of working on the vessel.[39] However, a few days before the Allision, Capt. Marceaux **did leave Eloi Bay at night**, and obviously did so in Quarantine Bay the night of the Allision, contrary to the vessel's general practice.[40]  And Settoon **knew** via the electronic "Zoho" log entries[41] (or should have known had

---

[37]  Ex. 12, p. 222.

[38]   Ex. 1, pp. 121-124.  The only reference in Settoon's SMS to the Lookout Rule merely restates/paraphrases the rule.  *See* Ex. 3, Setoon-984.

[39]  Ex. 10, pp. 84-87; 91-92; Ex. 9, p. 42, 67.

[40]  Ex. 10, p. 88.

[41]   The "Zoho" log system allowed Settoon captains (via the wheelhouse laptop) to enter electronic vessel log updates for scheduling purposes.  Moreover, the Settoon "Vessel to Marine Scheduler Communications" procedure required such updates via the Zoho sytem at 0600, 1200, 1800, & 2400 (i.e. each watch change), or alternatively (or in conjunction with) a cell phone call to the dispatcher.  *See* Ex. 3, Settoon 986-987; Ex. 1, p. 131-132.

9

it properly monitored the logs) that he did so.[42]   Likewise, **Settoon knew the evening of the**

**Allision** that Capt. Marceaux (via phone call with the port captain) intended to leave the field at

night if the weather cleared up - even though his last Zoho log entry at 1800 **indicated he was**

**not leaving until the next morning** - because a mechanic was on call for 7 AM the next

morning to work on the vessel's broken port generator.[43]

More importantly, at the time of the Allision, **Settoon already had an unwritten,**

**unofficial list of fields it did not run at night due to safety concerns**.   Specifically, after the

Allision, Settoon issued a formal email directive **prohibiting nigh navigation in a list of**

**specified inland oilfields** (including Quarantine and Eloi Bay), but this list included several

fields *Settoon had already "unofficially"* forbidden for nighttime navigation:

> A   [The] directive…was to… get with the port captains to identify-give me
> the worst ones we have, which…were facilities, locations**, fields that we**
> **did not run at night already -- already** -- which are included on this list.
> But after this, then we did a more -- had a more lengthy conversation.
>
> Q   Do you know which of these fields… were ones that were already on the
> verboten "don't run in these fields at night" list prior to the allision?
>
> A   There was no actual list.[44]

And at least one of these now-formally forbidden fields was **due to the previously known risk**

**of nighttime navigation because of the number of wells.[45]**   Settoon knew of the risks of

nighttime navigation in fields like Quarantine Bay, but made no effort to address them.

**C.   Settoon Completely Failed to Provide any Training/Procedures for -** *or to even*
*Identify* **- Numerous Electronic Aid to Navigation Systems**

The "Coastal Explorer" ECS system accessed via the wheelhouse laptop includes a

---

[42]  Ex. 25, Settoon-2596, 2817-2818; Ex. 1, p. 134-135.

[43]  Ex. 12, pp. 273-74; Ex. 25, Settoon-2820.

[44]  Ex. 7, p. 92; Ex. 26.

[45]  Ex. 7, p. 96.

"navigation object" function that allows users to mark important waypoints/objects on the ECS chart, and to add contextual navigational notes to those objects for guidance in voyage planning for future voyages and/or by captains who may be new to a route or who have not run the route in some time.[46]   The onboard GPS and radar systems provide the same functionality as well.[47] Post-Allision inspection of the Coastal Explorer system revealed several such navigation objects manually entered by captain/crew **with specific navigation notes**, including e.g. notes indicating an uncharted "Well" (i.e. a well not included on the NOAA chart) and warning to "[s]tay to the left when inbound."[48]   In fact, Capt. Marceaux **added a waypoint/navigation object <u>himself</u> <u>after</u> the Allision to mark the Well** (marking it as a "sunking [sic] well" in Coastal Explorer).[49]

Settoon, however, **did not provide any training, procedures, guidance, or best practices** to its crews regarding how and when to use the Coastal Explorer <u>or</u> GPS <u>or</u> radar waypoint/navigation objects function for safe voyage planning.[50]   In fact, both Capt. Marceaux and Capt. Spigner **had no recollection** of any formal training at all from Settoon for the Coastal Explorer system.[51]   Moreover, Settoon's shoreside management and port captains had access to Coastal Explorer in the Settoon offices, and could monitor and remotely add waypoint/navigation objects to the system; but Settoon **never used this capability** until after the Allision.[52]

Ironically, this precise safety mechanism (marking obstructions in ECS/GPS) **was raised *by Settoon itself* in the Bayou Perot case** in the testimony of then-safety manager Nick Carter:

---

[46]  Ex. 12, pp. 306-07; Ex. 1, p. 118.

[47]  Ex. 12, p. 219 (GPS); p. 308 (radar)

[48] Ex. 1, pp. 149-150, Ex. 16, p. 23; Ex. 7, pp. 117-118.

[49]  Ex. 12, p. 306; Ex. 27.

[50] Ex. 12, pp. 306-08; Ex. 7, p. 126; Ex. 1, p. 119.

[51]  Ex. 12, p. 191; Ex. 10, pp. 119-121.

[52]  Ex. 7, p. 119.

4814-1922-0835 v5
2900331-000046 05/18/2018

Q. [E]ven if it's dark and the [navaid] light is not on, what means are available for a Settoon captain to know the well is there and not run into it?

A   If he knows there is a well and he's running that run…**he could put a  little X on his GPS and let him know that it's a well there or it may not be lit or it may be lit…he can put that kind of information in his GPS.**[53]

Likewise, throughout this time, the Vessel's Coastal Explorer ECS system had multiple saved "tracks" that provided proven, unobstructed safe routes into and out of Quarantine Bay and to/from Cox's Tank Battery #2.[54]  The tracks are **literally bright red lines** (overlaid on the on-screen navigational chart of the area) that the vessel's captain could follow via the ECS interface as he navigated into/out of Quarantine Bay to ensure that he avoided any wellheads/other obstructions in the field.  But Settoon had no written or formalized process at the time of the Allision for voyage planning in oilfields; rather, captains would use proven "tracks," and "if the vessel did not have a track to a location, then the [Settoon] port captain would provide that vessel with a track line."[55]  Moreover, as the Lerille Email points out, Settoon's unwritten "system" was in fact a helter-skelter non-system: Settoon left captains to their own devices to choose at their own peril among multiple tracks,[56] none of which Settoon vetted.  Indeed, Settoon's testimony blatantly portrays that it *knew* captains were wending through oilfields with multiple different tracks, none of which Settoon vetted **simply because by chance no one had run over anything**:

Q      So there was never any review by the safety department, by the operations department, or by the port captains to determine what the closest points of approach were to any wells in the Q Bay field prior to the allision, correct?

A      Once again, short answer, no. The -- we -- in order to go to a facility, the boat -- prior to this, a boat had to have a proven successful track line. Each one of those was proven successful track lines. **So, no, nobody reviewed**

---

[53]  Ex. 28; Ex. 7, pp. 18-19 (identifying Carter as then safety manager).

[54]  *See* Ex. 27.

[55]  Ex. 1, p. 86.

[56]  Ex. 12, pp. 252-53; *see also* Ex. 7, pp. 111-12; 122-125 (noting many tracks pre-dated Settoon's fleet-wide adoption of Coastal Explorer, and were actually "ported in" to Settoon's system from various captains' **personal** Coastal Explorer accounts); Ex. 30.

**it, because if they weren't proven or successful, we would have hit**
**something a long time ago.**[57]

However, as the Lerille Email indicates, Settoon's management could and should have had a

vetting system in place (especially after Bayou Perot) for Settoon's safety department to vet **a**

**single safe track** and deleted any others; but no such vetting took place until *after* the Allision.[58]

But, if Settoon had decided to review and risk-vet the AIS tracks (shown below), much

less the saved Coastal Explorer ECS tracks[59] (which its port captains had the ability to review via

shoreside computers on the same ECS system installed on the vessels[60]), it would have learned

that captains on the Quarantine Bay route **were routinely cutting through the field** instead of

staying outside the field perimeter shown in red below (overlaid on NOAA Chart 11364):



[57] Ex. 7, pp. 111-112.

[58] Ex. 7, pp. 118-120; Ex. 1, pp. 92-93.

[59] Ex. 27; Ex. 30.

[60] Ex. 7, pp. 109-111; Ex. 30.

[61] This graphic is taken from the historic AIS tracks of the Vessel between February and October of 2017, overlaid on NOAA Chart 11364.  NOAA's official policy for charting wells in inland oilfields is NOT to chart every single well, but rather "the outermost platforms and a selection of the inner platforms, where necessary."  Ex. 33, p. 8.  The

And Settoon's corporate representative **admitted** that many of these prior tracks that passed as close as within 150 (much less 50) feet of the Well **would be unsafe for nighttime navigation**.[62]  Indeed, **he further acknowledged he had <u>no idea</u> why the vessel was not using the charted channel route** - a fact Settoon could and should have known from the various AIS and ECS tracklines to which its port captains and shoreside safety personnel had ready access:

> Q    So if you turned right there [where the marked channel ends on Chart 11364], you'd still have a bunch of wells … to cut through, correct?
>
> A    Yeah, if you turned there. **But you can get all the way outside Cox's field before you turn south**.
>
> Q    **Why weren't the Settoon vessels doing that, or why wasn't the MEGAN B doing that?**
>
> A    **I don't have any idea.**[63]

And even putting all this aside, **Settoon knew that navigating with track lines was inherently problematic** because the accuracy of the track line route depends entirely on *how far in/out* the ECS chart display is zoomed.  Amazingly, **Settoon had issued an internal "Lessons Learned" to *all boats*** (including the Vessel) **<u>a mere 3 weeks before the Allision</u>** detailing precisely this problem in the context of <u>a different allision</u> on the upper Mississippi River.[64]  However, neither Capt. Marceaux nor Capt. Spigner recalled *any* training regarding track lines, and thus Settoon did not ensure that its Lessons Learned was circulated to all crews.

In any event, as Capt. Marceaux testified, he had several apparently safe, previously traveled routes in Coastal Explorer, one of which he claims he was attempting to follow at the

---

redlines in the above graphic connect the channel from Tank Battery #2 to the "outermost" well as per the NOAA chart, and thus represent the perimeter Settoon vessels should have been navigating beyond to avoid any uncharted wells as per the chart/Coast Pilot warnings.

[62]  Ex 7, p. 116.

[63]  Ex. 7, p. 142.

[64]  Ex. 31; Ex. 1, p. 214, 220-223.

time of the Allision.[65]  Clearly, however, he did not do so.  He also had (or could have captured)
his own "crumb trail" trackline (either via GPS or his ECS) from the morning of the Allision, but
he admittedly did not follow it;[66] and in fact **ultimately deviated over 400 feet** from that route
he had followed just hours earlier.  Further, when Capt. Marceaux was asked why he didn't use
any of the warnings/alarms or other functionalities available in various electronic aids to
navigation aboard his vessel – including *inter alia* (1) the proximity warning on his radar (which
would have warned him that he was too close to the Well); (2) the "cross track" alarm on his
electronic charts and/or "off course" alarm on his GPS (which would have warned him that he
was off his pre-loaded route and/or his own route from earlier in the day); (3) the radar route
creation/retrace function; or (4) the "navigation object" function in his electronic charts (with
which he could have marked the Well as an obstruction, given that he *knew it was there* when he
navigated past it earlier that morning) – he said **he did not even know these functionalities
existed, and Settoon had never trained him (or even told him about) how to use them**:[67]

> Q    So we've gone through the manuals for …the radar, the Coastal Explorer
>      software, and the Garmin GPS. As I count it, there's at least five to six
>      alarms that could have been set either to keep track of the track that you
>      were trying to follow and how far off that course you were or objects
>      coming into your radar radius, and avoid a collision?
>
> A.   Probably.
>
> ***
>
> Q    Nobody in Settoon's safety department ever gave you any training or
>      guidance on any of these alarm functions on…these three pieces of
>      equipment? [form objection]
>
> A.   No.[68]

---

[65] Ex. 12, pp. 57; 82-83; 93-94.

[66] Ex. 12, p. 94.

[67] Ex. 12, pp. 254-255; 288-309.

[68] Ex. 12, pp. 303-04.

Yet, Settoon sent the USCG a July 2017 letter - a month after Capt. Marceaux **was fired for poor job performance** - stating that he was "able to operate and use all electronic equipment in the wheelhouse including radars…[and could] describe the use of all on board safety equipment and trains his crewmembers in the use of that equipment."[69]  This was demonstrably not true.

## II.  LAW AND ANALYSIS

### A.  Summary Judgment Standard

This Court has recently summarized the summary judgment standards:

> Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines that there is no genuine dispute of material fact. *See* Fed. R. Civ. P. 56. [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." The party seeking summary judgment need not produce evidence negating the existence of a material fact, but need only point out the absence of evidence supporting the other party's case.[70]

Cox bears the initial burden of proof as to causative <u>negligence</u> and/or <u>unseaworthiness</u>; and Settoon bears the secondary/shifted burden of proving <u>lack of privity and knowledge</u>.[71]

Further, "the Fifth Circuit [has recognized that in bench-tried cases], if there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved[;] [i.e.] if a trial on the merits will not enhance the court's ability to draw inferences and conclusions, then the court should draw those inferences without resort to the expense of trial."[72]

And while summary judgment on limitation of liability is rare (particularly in this

---

[69]  Ex. 32.

[70]  *Int'l Marine, LLC v. Integrity Fisheries, Inc.*, 2018 WL 1123581, at *1 (E.D. La. Feb. 28, 2018).

[71]  *Farrell Lines Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976).

[72]  *Regions Bank v. Gator Equip. Rentals, LLC*, 2016 WL 4429947, *3 (E.D. La. Aug. 22, 2016) (citations omitted).

4814-1922-0835 v5
2900331-000046 05/18/2018

District), when there is unequivocal negligence/unseaworthiness within the indisputable privity and knowledge of the owner, "[t]he court **shall grant** summary judgment" under Rule 56.[73]

## B.    Limitation of Liability - Two Step Process

The Fifth Circuit applies a two-step analytical framework for determining a vessel owner's claim for limitation of liability: "First, the court must determine [on the claimant's burden] what acts of negligence or conditions of unseaworthiness caused the accident[;] [and] [s]econd [on the vessel owner's burden]...whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness."[74]  "Knowledge...is judged not only by what the [shipowner's] managing officers actually knew, but also by what they should have known with respect to conditions or actions likely to cause the loss."[75]  The owner's "burden is not met by simply proving a lack of actual knowledge, for **privity and knowledge is established where the means of obtaining knowledge exist**, or where reasonable inspection would have led to the requisite knowledge."[76]  Thus, "[p]rivity or knowledge ... is deemed to exist if the shipowner has the means of obtaining knowledge, or if he would have obtained the knowledge by reasonable inspection."[77]

Modern courts have expanded the scope of corporate privity and knowledge:

The recent judicial trend has been to expand the scope of activities that fall within the privity of the owner...including ... requiring shipowners to exercise an 'ever-

---

[73] *See, e.g., Borque v. D. Huston Charter Servs., Inc.*, 525 F. Supp. 2d 843, 848 (S.D. Tex. 2007) (dismissing limitation on summary judgment when owner could not dispute evidence that "crew of [the vessel] caused...allision because of inadequate hiring or training[.]"); *Am. Dredging Co. v. Lambert*, 81 F.3d 127 (11th Cir. 1996) ("affirm[ing] ...summary judgment denying...petition for exoneration from or limitation of liability"); *In re Nagler*, 246 F. Supp. 3d 648 (E.D.N.Y. 2017) (granting summary judgment dismissal of limitation based on undisputed evidence of privity and knowledge); *In re Bald Head Island Transp., Inc.*, 124 F. Supp. 3d 658, 674 (E.D.N.C. 2015) (granting summary judgment dismissal of limitation based on undisputed evidence of privity and knowledge).

[74] *Farrell Lines Inc.*, 530 F.2d at 10; *Complaint of Patton–Tully Transp. Co.*, 797 F.2d 206, 211 (5th Cir.1986).

[75] *Trico Marine Assets Inc. v. Diamond B Marine Servs. Inc.*, 332 F.3d 779, 789–90 (5th Cir. 2003).

[76] *Hercules Carriers, Inc. v. Florida*, 768 F.2d 1558, 1564 (11th Cir.1985)).

[77] *Brister v. A.W.I., Inc.*, 946 F.2d 350, 358 (5th Cir. 1991).

increasing degree of supervision and inspection[.]" If an injury occurs as a result of a shipowner's **failure to use "due and proper care to provide a competent crew," that negligence is necessarily "within the owner's privity**."[78]

The Fifth Circuit has held that the Limitation of Liability Act is "now hopelessly anachronistic" and must be applied narrowly and constrictively.[79]  And given "modern technology [and the] increasing eas[e] [of] maintain[ing] communication with vessels…[t]he more restricted the operation in which a vessel is engaged, the greater…the control which the corporate owner will be expected to exercise[;] **[t]he duty to control…increases with the possibility of control."**[80]

Thus, "failure to provide an adequate program to train the crew may, by itself, allow for a finding of privity or knowledge," arising from the owner's "nondelegable duty to provide a seaworthy vessel[,] [which] converges with its duty to use reasonable means to acquire knowledge calculated to inform [itself] of conditions likely to…contribute to unseaworthiness."[81] "Limitation has [also] been denied where a ship was…[effectively] not equipped with [functional navigation equipment] **because she was not equipped with a master or officers trained to use it**[,] [as well as] where the incompetence of the navigator makes the vessel unseaworthy."[82]

Further, "knowledge of [a] history of [vessel] operation[s] in conditions of reduced visibility is precisely the sort of knowledge of shore-based managing officials that vitiates the right to limit."[83]  And when "[t]he record indicates that on the day of the accident [management] knew that the vessel was being operated in [unsafe conditions, and] also knew that the vessel

---

[78]  *In re Moran Towing Corp*., 996 F. Supp. 2d 221 (S.D.N.Y. 2014) (citations/quotations omitted).

[79]  *Cont'l Oil Co. v. Bonanza Corp*., 706 F.2d 1365, 1376 (5th Cir. 1983).

[80]  *In the Matter of Texaco, Inc*., 570 F. Supp. 1272,1279 (E.D. La. 1983); 1985 A.M.C. 1650.

[81]  *Brister v. A.W.I., Inc*., 946 F.2d 350, 356-57 (5th Cir.1991) (citing *Hercules* 768 F.2d at 1563).

[82]  *Complaint of Waterstand Marine, Ltd*., 1988 WL 78776, at *13 (E.D. Pa. July 26, 1988) (citing *TUG OCEAN PRINCE, INC. v. United States*, 584 F.2d 1151 (2nd Cir.1978); *Matter of TA CHI NAVIGATION (PANAMA) CORPORATION, S.A*., 513 F.Supp. 148 (E.D.La.1981) *aff'd*, 728 F.2d 699 (5th Cir.1984)).

[83]  *In re: Diamond B Marine Servs., Inc*., 2001 WL 1164914, at *14 (E.D. La. Sept. 28, 2001) *aff'd sub nom. Trico Marine Assets, Inc. v. Diamond B Marine Svcs., Inc.*, 332 F3d 779 (5th Cir. 2003); 2003 A.M.C. 1355 (quoting *Pennzoil Producing Co. v. Offshore Exp., Inc*., 943 F.2d 1465, 1474 (5th Cir. 1991)).

routinely operated in [such conditions,] [s]uch knowledge vitiates the right to limit liability."[84]

**C.**   **Settoon/Capt. Marceaux Admittedly/Presumptively Caused the Allision due to Fault/the Unseaworthiness within Settoon's Privity & Knowledge**

Under step one of the limitation analysis, it is undisputed, based on Settoon's admissions in the Lerille Email and the "at fault" finding in Settoon's Netsuite report, that (1) Capt. Marceaux/Settoon were at fault (2) due to "management failures" of Settoon.[85]

Settoon is also **presumptively** at fault under the *Oregon* and *Pennsylvania* Rules, the former of which "creates a **presumption of fault** that shifts the burden of production and persuasion to a moving vessel who, under her own power, allides with a stationary object;"[86] and the latter of which imposes the "awesome **rule of causation**"[87] that "a party who fails to observe a safety regulation [must meet] the burden of showing not merely that [its] fault might not have been one of the causes [of the loss], or that it probably was not, **but that it could not have been**."[88]  These presumptions of fault/causation satisfy the first step of the limitation analysis.[89]

And as to step two, Settoon's/Capt. Marceaux's numerous regulatory violations trigger the *Oregon/ Pennsylvania* Rules, resulting in (1) presumptive fault, (2) **within Settoon's privity and knowledge** due to the unseaworthiness of the vessel stemming from Settoon's failure to institute proper training and safety procedures:

- **33 CFR §164.78** requires that "[t]he owner, master, or operator of each vessel towing shall ensure that each person directing and controlling the movement of the vessel":

---

[84]   *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 504 (5th Cir. 1994).

[85]   Ex. 4; Ex. 2.

[86]   *Combo Maritime, Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 604 (5th Cir. 2010).

[87]   *In re Mid-South Towing Co.,* 418 F.3d 526, 531 (5th Cir. 2005).

[88]   *United States v. Nassau Marine Corp.*, 778 F. 2d 1111, 1116 (5th Cir. 1985) (emphasis added). *In re Mid-South Towing Co.,* 418 F.3d 526, 531 n.5 (5th Cir. 2005).  While the rule has its genesis in the law of collision, "[t]he rule applies to allisions as well." *Osprey Ship Mgmt. Inc. v. Foster*, 387 Fed. Appx. 425, 434; 2010 WL 2725236, 7 (5th Cir. July 1, 2010). *See, e.g., In re Blessey Enters., Inc*., 2010 WL 3720906, *4 (E.D. La. Sept. 9, 2010) (Fallon, J.).

[89]   *In the Matter of Texaco, Inc.*, 570 F. Supp. 1272,1279 (E.D. La. 1983).

19

- ○ **(a)(2) -** "[c]an fix the position of the vessel using installed navigational equipment, aids to navigation, geographic reference-points, and hydrographic contours[.]" Capt. Marceaux admittedly **did not know how to use** multiple navigation aid systems on the Vessel - and in fact *did not even know they existed*; and Settoon failed to provide any training/procedures/guidance as to these systems.

- ○ **(a)(4) -** "[e]valuates the danger of each closing visual or radar contact." Capt. Marceaux **did not and apparently could not** evaluate his radar properly because he failed to see the Well on the night of the Allision. Likewise, the Lerille Email confirms that Settoon's radar policies, training and equipment were inadequate as a result of "management failures."

- ○ **(a)(8) -** "[m]onitors the voyage plan required by § 164.80." Neither Capt. Marceaux, nor the Settoon shoreside safety personnel who received the voyage plans, monitored the plans because the plans referred to **the wrong chart** and were not corrected.

- **33 CFR §164.80 -** requires that "[t]he owner, master, or operator of each towing vessel of less than 1,600 GT shall ensure [before any] voyage of more than 24 hours or when each new master or operator assumes command…[1] **A test of all installed navigational equipment**[;] [2] **Operation of all…vessel-control alarms, if installed**. Capt. Marceaux did not "test" or "operate" - because **he did not even know about** - any of the various alarm functions in the "installed navigation equipment" aboard the vessel; and Settoon failed to provide any training/procedures to ensure that this requirement was met.

- **33 CFR §83.05 - Look-Out Rule (Rule 5) -** "Every vessel shall at all times maintain a proper look-out by sight and hearing **as well as by all available means appropriate** in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." Under USCG guidance regarding the Lookout Rule, "in all but the smallest vessels, the lookout is expected to be an individual **who is not the helmsman**."[90] Moreover, numerous cases have held that failure to post a **separate** look out (and/or have any procedures regarding same) **during nighttime navigation in oilfields violates the Lookout Rule as a matter of law** (and may warrant denial of limitation).[91] Indeed, the caselaw is clear that when one person's "duties [are] divided among the lookout, the radar, and the wheel [i.e. navigation]" **this is a violation of the Lookout Rule as a matter of law**;[92] "[when] the helmsman ha[s] to divide his duty as a

---

[90]   United States Coast Guard, NAVRULES FREQUENTLY ASKED QUESTIONS, https://www.navcen.uscg.gov/?pageName= navRulesFAQ. *See also Clary Towing Co. v. Port Arthur Towing Co.*, 367 F. Supp. 6, 11 (E.D. Tex. 1973) ("Generally, a lookout is a person other than the pilot who has the duty of observing sounds, lights, echoes and obstructions to navigation").

[91]*Cont'l Oil Co. v. M. S. Glenville*, 210 F. Supp. 865, 866 (S.D. Tex. 1962); *Placid Oil Co. v. S. S. Willowpool*, 214 F. Supp. 449, 452 (E.D. Tex. 1963) (failure to post proper lookout even on clear night "perfect for sailing" was negligent violation of Lookout Rule that caused allision); *In re Texaco, Inc.,* 570 F. Supp. 1272 (E.D. La. 1983) (denying limitation); *In re Cameron Boat Rentals, Inc.*, 683 F. Supp. 577, 579 (W.D. La. 1988) (denying limitation); *Seacarriers Mar. Co. v. M/T Stolt Jade*, 823 F. Supp. 1311, 1313 (E.D. La. 1993) ("[M]aster failed to assign a lookout to watch for oncoming traffic or structures," constituting violation of Lookout Rule in platform collision); *In re: Diamond B Marine Servs., Inc.*, 2001 WL 1164914, at *14 (denying limitation).

[92] *Cameron Boat Rentals,* 683 F. Supp. at 583.

lookout[,] [t]his… constitutes a clear breach of [the Lookout Rule]."[93]  Thus, "attempting to navigate the vessel, to handle communications, to watch the radar and to serve as look-out…[is] clearly a violation of the [the Lookout Rule]."[94]  Capt. Marceaux violated the Lookout Rule  even by his own patently erroneous "tight quarter" formulation - by not posting a separate lookout while attempting to simultaneously monitor/manipulate radar/Coastal Explorer/line-of-sight/search light during night transit in an oilfield with known uncharted wells that he passed within only 50 yards and admittedly had not been comfortable transiting *even during daylight*.  Capt. Marceaux's lookout failures, stemming from Settoon's complete failure to provide any specific Lookout Rule training, guidance, or procedures, even after Bayou Perot, rendered the vessel unseaworthy.

- **46 C.F.R. § 35.01-50 -** In addition to the *general* violation of the Lookout Rule, Capt. Marceaux/Settoon likewise violated the *specific* rule applicable to navigation with "red flag" crude oil barges in tow.  This section requires that "[d]uring the time the cargo tanks contain [crude oil], the barge shall be under constant surveillance [and] [a] **strict watch of each unmanned barge in tow shall be maintained from the towing vessel** while underway[;] [likewise] a towing vessel engaged in transporting such unmanned barges shall not leave them unattended."  If dividing lookout duty with radar monitoring and steering violates the rule, then any attempt to divide all three of these tasks, plus manipulating the searchlights, ***with the strict dangerous cargo watch*** required by 46 CFR 35.01-50, likewise violates both this regulation and the Lookout Rule.  Again, Settoon's failure to provide any guidance on this requirement, knowing full well the risks of night transiting of inland oilfields and (via Zoho logs) that Capt. Marceaux was running at night, rendered the vessel unseaworthy within Settoon's privity and knowledge.

- **33 CFR §83.07 - Risk of collision (Rule 7) -** "(a) Every vessel **shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist**. (b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects. (c) Assumptions shall not be made on the basis of scanty information, especially scanty radar information."  Capt. Marceaux *did not even know* about multiple "available means" in the Vessel's navigation equipment for assessing the risk of/avoiding allisions.  And the reason he did not even know they existed, much less how to use them, was Settoon's failure to provide any training or procedures regarding those systems.

"[F]ailure to provide an adequate training program…[that results in crew being]

uninformed as to the Inland Rules of the Road[;] … failure to post or properly inform a diligent

lookout who had no other duties[;]…failure to plot or reaffirm the position of the [vessel];

---

[93] *ANR Prod. Co. v. M/V MEKHANIK DREN*, 1989 WL 180064, at *6 (S.D. Tex. July 14, 1989).

[94] *St. Phillip Offshore Towing Co. v. Wisconsin Barge Lines*, 466 F.Supp. 403 (E.D.La.1979).

failure to insure the safe navigation of the [vessel] by requiring compliance with the rules of the road in restricted visibility," when such failures contribute to a maritime accident, "are *directly* attributable to [the vessel owner] in failing to exercise due diligence in selecting, training and maintaining a competent crew."[95]   Settoon's failures to properly train/provide guidance to Capt. Marceaux on these regulatory requirements, and its failure to provide any guidance/procedures for all available aids to navigations - **knowing** he was navigating in oilfields at night - **all coalesce into unseaworthiness within its privity and knowledge.**

And danger of allisions with oilfield structures in the Breton Sound area **is a judicially recognized fact in this District**; and failure to account for this risk **renders a vessel unseaworthy**:

> Perhaps the most obvious peril facing mariners in Breton Sound **is the number of oil structures and other obstructions found throughout its waters**… [S]hip owners whose vessels operate in Breton Sound must take reasonable steps to ensure that their vessels do not allide with these obstructions.  **A failure to take these steps renders a vessel operating in Breton Sound unseaworthy.**[96]

Settoon's **admitted** "failure to take reasonable steps" for its Quarantine Bay/Breton Sound operations - including *inter alia* failure to properly evaluate Capt. Marceaux; failure to monitor his recent history of operation in limited nighttime visibility and/or the safety of the historic tracks of the Vessel; and failure to provide any guidance/training regarding nighttime navigation in oilfields, the Lookout Rule, and use of available navigation aids (radar, ECS, GPS, etc.) - all amount to unseaworthiness within Settoon's privity and knowledge.

And any effort by Settoon to claim mere "errors in navigation" outside of its privity/knowledge fails in the face of its numerous, indisputable failures to provide **any relevant training/guidance at all** to Capt. Marceaux, resulting in the Vessel's unseaworthiness:

---

[95]  *Hercules*, 758 F.2d 1756-57.

[96] *In Re Supreme Towing Co., Inc.*, 2010 WL 11561150 (E.D. La. Aug. 12, 2010) (denying limitation).

22

The fact that navigational errors figured heavily in the accident does not negate privity or knowledge. **Such errors are imputable to the owner where they are the natural consequence of the owner's unwritten policies** … [T]he utter failure of the owner to educate its non-radar-certified pilots or to require compliance with regulations, worked a deadly combination. The complainants have failed to establish that they lacked privity with the negligent acts causing the allision.[97]

\*\*\*

**[I]f incompetence results in a navigational error… it is crew incompetence, and therefore the unseaworthiness of the vessel**, which has caused the … damage. **The fact that the unseaworthiness can be labeled as an error in navigation does not magically protect the shipowner from liability**. At some point along a spectrum of performance competency, an error in navigation is attributable to [crew] incompetence [amounting to unseaworthiness in the owner's privity/knowledge].[98]

Settoon sent out Capt. Marceaux, who was admittedly "uncomfortable" navigating into Quarantine Bay, and who was **never** formally evaluated for navigation in Quarantine Bay/Breton Sound and who *hadn't been evaluated at all* in over four years, to navigate a vessel when he had **no clue of the existence of** (much less how to use) multiple, critical aids to navigation for **that would and could have avoided the Allision**.   Settoon also knew (after Bayou Perot), or certainly should have known, of the risk of nighttime navigation in oilfields and of the existence of uncharted/unlit wells in such fields; and knew, or should have known if it had monitored the Zoho logs, that Capt. Marceaux was navigating at night.   And finally, as the Lerille email states in no uncertain terms, Settoon's "track line" policy **-** which was really no policy at all - was entirely inadequate for safe night navigation in Quarantine Bay, and an admitted "management failure."   "In short, the facts…in this case **go far beyond mere navigational errors**."[99]

**And indistinguishable cases** from this Court and the Fifth Circuit mandate this finding.

First, Judge Beer in *In re Texaco, Inc.* denied limitation to a vessel owner in remarkably similar circumstances after an allision with an oil platform.   The vessel was transiting a prior

---

[97] *In re Cameron Boat Rentals, Inc.*, 683 F. Supp. 577, 585 (W.D. La. 1988) (emphasis added).

[98] *In re Ta Chi Navig. (Panama) Corp., S.A.*, 513 F.Supp. 148,158 (E.D.La.1981), *aff'd* 728 F.2d 699 (5th Cir. 1984).

[99] *Trico Marine*, 332 F.3d at 790.

23

route that it had "travelled … about two and half times a month[,] eleven months out of the year;" attempting to follow "an established course line" that ultimately "was not being followed with precision"; using a separate lookout, but one improperly positioned and thus ineffective; failing to properly monitor/maintain up to date charts; and navigating with a radar that was functioning, but suffering interference from the vessel's foremast.[100] **All these failures** ultimately precluding limitation in *Texaco* **exist in this case**: the Vessel ran over the Well on a route it had travelled +50 times, due to Capt. Marceaux's failure to follow a safe track line or post a lookout; Settoon's existing problems/failures (as the Lerille Email and Settoon's own expert admit) with respect to a radar that "sometimes" picked up oil platforms and "sometimes" did not; and Settoon/Capt. Marceaux's use of the **wrong chart** for voyage planning and failure to mark the known Well as a navigation object, which Settoon never corrected.  This case is even more egregious due to Capt. Marceaux's *total failure* to post a look out (as opposed to the merely inadequate lookout in *Texaco*) and Settoon's systemic failure to provide adequate safety procedures/training.

And in *Trico Marine* the Fifth Circuit also denied limitation **on nearly identical facts** because the vessel owner: "1) failed to provide a lookout; 2) failed to train [the captain] to use a radar; 3) failed to evaluate the [vessel's] seaworthiness or [the captain's] competence… 4) failed to inspect the vessel logs; 5) failed to employ a safety manager; and, 6) failed to provide safety training or safety manuals[;]… [and also] knew the [vessel] had operated in the fog and would continue to do so, yet employed a captain without the proper qualifications and **without adequate policies or procedures to guide him**."[101]

**Settoon committed these same basic failures** - it did not train or provide any guidance

---

[100] 570 F. Supp. at 1275-76; 1286; 1288-89.  *See also Supreme Towing Co., Inc.*, 2010 WL 11561150 at p. 24.

[101] *In re Diamond B Marine Svcs., Inc.*, 2001 WL 1164914 (E.D. La. Sept. 28, 2001).

to Capt. Marceaux regarding the Lookout Rule generally or for nighttime navigation of oilfields (effectively failing to provide a lookout by failing to equip him to properly follow the Lookout Rule); did not train him to use any of the available electronic navigation equipment on the Vessel; failed to evaluate his competence because it *never* evaluated him as a captain; failed to monitor/inspect vessel logs (which would have revealed his night transiting); and generally failed to provide and/or to adhere to proper safety guidelines and training for the risks of nighttime transiting of oilfields.  To (again) quote the Fifth Circuit, "the present case presents far more than mere navigation error…[and Settoon] knew, or should have known, that [the Vessel] was unseaworthy and that its captain was improperly trained."[102]

### III.     CONCLUSION

The egregious, undisputed facts of this case, Settoon's admissions, and the applicable presumptions definitively and unequivocally preclude limitation.  The Vessel was unseaworthy due to Capt. Marceaux's incompetence as a result of Settoon's myriad, admitted, and indisputable "management failures."   Cox urges the Court to dismiss Settoon's Complaint for/affirmative defense of limitation, and likewise reserves its right to seek attorney's fees and costs for Settoon's frivolous assertion/pursuit of limitation in this case.[103]

---

[102] *Trico Marine Assets*, 332 F.3d at 790.

[103] *See Moench v. Marquette Transp. Co. Gulf-Inland, L.L.C.,* 838 F.3d 586, 595 (5th Cir. 2016) ("Even when a party is pursuing a meritorious claim or defense, sanctions may be assessed when the party abuse[s] ... the judicial process[;]…[p]ursuing "an aggressive litigation posture" is not an abuse of the judicial process, [b]ut advocacy simply for the sake of burdening an opponent with unnecessary expenditures of time and effort clearly [is].").

Respectfully submitted,

**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ**

BY: */s/ Christopher M. Hannan*
ROBERT C. CLOTWORTHY (#04204)
CHRISTOPHER M. HANNAN (#31765)
KRISTEN L. HAYES (#36490)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000

*Attorneys for Plaintiffs/Claimants*
*Cox Operating, LLC et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>18th</u> day of May, 2018, a copy of the above pleading was served on all counsel of record via the Court's CM/ECF system.

*/s/ Christopher M. Hannan*

4814-1922-0835 v5
2900331-000046 05/18/2018